# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA

FILED

| | |
|---|---|
| KERRIE BORBOA, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) |
| THEODORE L. CHANDLER, JANET A. ALPERT, GALE K. CARUSO, MICHAEL DINKINS, CHARLES H. FOSTER, JR., JOHN P. MCCANN, DIANNE M. NEAL, ROBERT F. NORFLEET, JR., ROBERT T. SKUNDA, JULIOUS P. SMITH, JR, THOMAS G. SNEAD, JR, EUGENE P. TRANI, MARSHALL B. WISHNACK, ROSS W. DORNEMAN, G. WILLIAM EVANS, EMPLOYEE BENEFITS COMMITTEE OF LANDAMERICA FINANCIAL GROUP, INC. and DOES 1-10, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

2013 DEC 20  P 4: 37

CLERK US DISTRICT COURT
RICHMOND, VIRGINIA

CIVIL ACTION NO.: 3:13CV 844

**CLASS ACTION COMPLAINT**

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff Kerrie Borboa ("Plaintiff") was a participant in the LandAmerica Financial Group Employee Savings and Stock Ownership Plan (the "Plan") during the proposed Class Period (defined below), and alleges as follows on behalf of the Plan, herself and a class of all others similarly situated.

## PREFACE

1.      On November 26, 2008 LandAmerica Financial Group, Inc. ("LFG" or the "Company") filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of Virginia.  The bankruptcy is ongoing.  As such, this action is stayed as to

LFG unless and until such time as the stay is lifted or relief from the stay is granted by the bankruptcy court. Currently, Plaintiff is not prosecuting this action vis-a-vis LFG.

2. If the bankruptcy stay is modified or lifted to permit further prosecution of this action against LFG, Plaintiff will notify the Court and seek to amend this Complaint to add LFG as a defendant in this action in accordance with the Federal Rules of Civil Procedure and this Court's rules.[1]

3. All allegations contained herein are based upon personal information as to Plaintiff herself and the investigation of Plaintiff's counsel. It is likely that, once the discovery process begins in earnest, the roles of additional persons or entities in the wrongdoing outlined below will be revealed and the wrongdoing itself will be further illuminated. In that event, Plaintiff will seek to amend this Complaint to add new parties and/or new claims against those parties and/or existing parties in accordance with the Federal Rules of Civil Procedure and this Court's rules.

### INTRODUCTION

4. This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries.

5. Plaintiff was a participant in the Plan during the Class Period (defined below), during which time the Plan held interests in the common stock of LFG ("LFG Stock" or "Company Stock"). Plaintiff's retirement investment portfolios in the Plan during the Class Period included LFG Stock.

---

[1] Plaintiff, if permitted to bring an action against LFG, would allege that LFG, a fiduciary to the Plan, breached its fiduciary duties to the Plan (as defined below) and its participants under ERISA (as defined below) by its own actions regarding the Plan's administration and management of its assets. LFG is also responsible for the actions of its employees and agents through the doctrine of *respondeat superior* and/or ERISA Section 405.

6.     401(k) plans confer tax benefits on participating employees to incentivize saving for retirement and/or other long-term goals. An employee participating in a 401(k) plan may have the option of purchasing the common stock of his or her employer, often the sponsor of the plan, for part of his or her retirement investment portfolio.  LFG Stock was one of the investment alternatives of the Plan throughout the Class Period.

7.     Plaintiff alleges that Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their duties owed to the Plan, to her and to the other participants and beneficiaries of the Plan in violation of ERISA §§ 404(a) and 405, 29 U.S.C. §§ 1104(a) and 1105, particularly with regard to the Plan's holdings of LFG Stock.

8.     Specifically, Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of Plan assets, breached their fiduciary duties to the Plan, her, and the proposed Class by failing to prudently and loyally manage the Plan's investment in Company equity through:  (1) continuing to offer LFG Stock as a Plan investment option when it was imprudent to do so; and (2) maintaining the Plan's pre-existing significant investment in LFG's equity when Company Stock was no longer a prudent investment for the Plan.  These actions/inactions run directly counter to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement. *See* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY").

9.     Plaintiff's Count II alleges that certain Defendants failed to avoid or ameliorate inherent conflicts of interests which crippled their ability to function as independent, "single-minded" fiduciaries with only the Plan's and their participants' best interests in mind.

3

10.     Plaintiff's Count III alleges that certain Defendants breached their fiduciary duties by failing to adequately monitor other persons to whom management/administration of Plan assets was delegated, despite the fact that such Defendants knew or should have known that such other fiduciaries were imprudently allowing the Plan to continue offering LFG Stock as an investment option, and investing Plan assets in LFG Stock when it was no longer prudent to do so.

11.     Plaintiff alleges that Defendants allowed the imprudent investment of the Plan's assets in LFG equity throughout the Class Period despite the fact that they clearly knew or should have known that such investment was imprudent because, as explained below in detail and among other things: (a) LFG's title insurance operations were devastated by the collapse of the subprime mortgage industry; (b) LFG was exposed to the inherently risky practices of its subsidiary LandAmerica 1031 Exchange Services, Inc. ("LES"), which imprudently gambled its survival upon the stability of the auction rate securities market; (c) LFG concealed the truth concerning its rapidly deteriorating condition and the impact of the frozen auction rate securities market on its ability to continue as a going concern; and (d) as a consequence of the above, significant investment of employees' retirement savings in Company Stock would inevitably result in substantial losses to the Plan and, consequently, to the Plan's participants.

12.     This action is brought on behalf of the Plan and seeks losses to the Plan for which Defendants are liable pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132. Because Plaintiff's claims apply to the Plan, inclusive of all participants with accounts invested in Company Stock during the Class Period, and because ERISA specifically authorizes participants such as Plaintiff to sue for relief to the Plan for breaches of fiduciary duty such as

4

those alleged herein, Plaintiff brings this as a class action on behalf of the Plan and all participants and beneficiaries of the Plan during the proposed Class Period.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

14.    Venue is proper in this district pursuant to ERISA section 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and LFG had its principal place of business in this district. Further, many of the Plan's participants are located in or within close proximity to this district.

## PARTIES

**Plaintiff**

15.    Plaintiff Kerrie Balboa is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of LFG Stock in her retirement investment portfolio during the Class Period.

**Defendants**

Director Defendants

16.    Defendant Theodore L. Chandler ("Chandler") served as Chairman, Chief Executive Officer and Director of LFG during the Class Period. Further, Defendant Chandler served as Chair of the Company's Executive Committee during the Class Period. *See* LandAmerica Financial Group, Inc., Definitive Proxy Statement (Form DEF 14A), at 14 (March 23, 2008). Defendant Chandler was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or

5

control over Plan management and/or authority or control over management or disposition of Plan assets.

17.     Defendant Janet A. Alpert ("Alpert") served as a director of LFG during the Class Period. Further, Defendant Alpert served as a member of LFG's Investment Funds Committee during the Class Period. *See Id.* Defendant Alpert was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

18.     Defendant Gale K. Caruso ("Caruso") served as a director of LFG during the Class Period. Further Defendant Caruso served as a member of LFG's Investment Funds Committee and held the title of Vice Chairman during the Class Period. *Id.* Defendant Caruso was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

19.     Defendant Michael Dinkins ("Dinkins") served as a director of LFG during the Class Period. Further, Defendant Dinkins served as a member of both LFG's Investment Funds Committee and Executive Committee during the Class Period. *Id.* Defendant Dinkins was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

20.     Defendant Charles H. Foster, Jr. ("Foster") served as a director of LFG during the Class Period. Further, Defendant Foster served as a member of LFG's Investment Funds Committee during the Class Period. *Id.* Defendant Foster was a fiduciary of the Plan, within

the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

21.    Defendant John P. McCann ("McCann") served as a director of LFG during the Class Period. Further, Defendant McCann served as a member of LFG's Executive Compensation Committee and Executive Committee and as Chairman of its Investment Funds Committee during the Class Period. *Id.* Defendant McCann was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

22.    Defendant Dianne M. Neal ("Neal") served as a director of LFG during the Class Period. Further, Defendant Neal served as a member of LFG's Executive Compensation Committee during the Class Period. *Id.* Defendant Neal was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because she exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

23.    Defendant Robert F. Norfleet, Jr. ("Norfleet") served as a director of LFG during the Class Period. Defendant Norfleet was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

24.    Defendant Robert T. Skunda ("Skunda") served as a director of LFG during the Class Period. Defendant Skunda was a fiduciary of the Plan, within the meaning of ERISA

Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

25.     Defendant Julious P. Smith, Jr. ("Smith") served as a director of LFG during the Class Period. Further, Defendant Smith served as a member of LFG's Investment Funds Committee during the Class Period. *Id.* Defendant Smith was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

26.     Defendant Thomas G. Snead, Jr. ("Snead") served as a director of LFG during the Class Period. Further, Defendant Snead served as a member of LFG's Executive Compensation Committee and Executive Committee during the Class Period. *Id.* Defendant Snead was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

27.     Defendant Eugene P. Trani ("Trani") served as a director of LFG during the Class Period. Further, Defendant Trani served as a member of LFG's Executive Compensation Committee and Executive Committee during the Class Period. *Id.* Defendant Trani was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

28.     Defendant Marshall B. Wishnack ("Wishnack") served as a director of LFG during the Class Period. Further, Defendant Wishnack served as Chair of LFG's Executive

Compensation Committee and as a member of the Company's Executive Committee during the Class Period. *Id.* Defendant Wishnack was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

Employee Benefits Committee

29.     The Employee Benefits Committee was appointed by the Directors and charged with general administration of the Plan. *See* LandAmerica Financial Group, Inc., Annual Report for the Plan (Form 11-K) (June 30, 2009) (the "2008 Form 11-K"), attached hereto as Exhibit A.

30.     Defendant Ross W. Dorneman ("Dorneman") served as LFG's Executive Vice President and Chief Administrative Officer during the Class Period and previously served as the Company's Executive Vice President-Human Resources.   On or about June 26, 2008, Defendant Dorneman signed the 2007 Form 11-K submission to the Securities and Exchange Commission ("SEC") for the Plan on behalf of LFG, as the Plan Administrator.   Upon information and belief, Defendant Dorneman was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

31.     Defendant G. William Evans ("Evans") served as Executive Vice-President and Chief Financial Officer of LFG during the Class Period. On or about June 30, 2009, Defendant Evans signed the 2008 Form 11-K submission to the Securities and Exchange Commission ("SEC") for the Plan on behalf of LFG, as the Plan Administrator.   Upon information and belief, Defendant Evans was a fiduciary of the Plan, within the meaning of ERISA Section

3(21)(A), 29 U.S.C. § 1002(21)(A), because he exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

32. The Doe Defendants include members of the Employee Benefits Committee, the identities of whom are currently unknown to Plaintiff. Plaintiff reserves the right, once their identities are ascertained, to seek leave to join the members of the Employee Benefits Committee to the instant action, as well as any other officers, directors and employees LFG who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## THE PLAN

33. During the Class Period, the Plan was an "employee pension benefit plan" as defined by ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Specifically, the Plan was a "defined contribution plan" within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

34. The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither a defendant nor a plaintiff. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants and beneficiaries.

35. The Plan was sponsored by LFG and administered by the Company through the Employee Benefits Committee. *See* 2008 Form 11-K.

36. The Plan purchased shares of LFG Stock and held it in a trust for allocation to eligible participants' accounts. *See Id.*

37. Employees of the Company and its participating subsidiaries were generally eligible to participate in the Plan after completing 30 days of employment. *Id.*

38. Allocations of Company Stock were based on a participant's earnings or account balances, as defined in the Plan document. *Id.*

10

39.     Participants were immediately vested in their contributions plus actual earnings and in Company matching contributions, which were made after January 1, 2005. Vesting in the Company's matching and discretionary contributions, which were made prior to January 1, 2005, and actual earnings thereon was based on years of service. Prior to July 31, 2009, participants became 100% vested in these contributions after six years of service. However, on May 21, 2009 the Board of Directors elected to terminate the Plan, effective July 31, 2009 and upon such termination, all participants became 100% vested in their accounts. *Id.*

40.     The Plan provided that participants in the Plan could direct the investment of their account balances among fourteen investment options, one of which was the Company Stock until November 26, 2008, the date on which the Company filed for bankruptcy protection. *Id.*

41.     As of December 31, 2007, the Plan held 812,908 shares of LFG Stock, then valued at approximately **$28.4 million**. Just one year later, as of December 31, 2008, while the number of shares of Company Stock in the Plan had increased to 850,577 shares, the value of Company Stock in the Plan had plummeted to a mere **$76,552**. *Id.*

## CLASS ACTION ALLEGATIONS

42.     Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on behalf of the Plan, herself and the following class of persons similarly situated (the "Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the LandAmerica Financial Group, Inc. Savings and Stock Ownership Plan at any time between June 30, 2008[2] and July 31, 2009 (the

---

[2]  Plaintiff reserves her right to seek modification of the Class Period definition in the likely event that further investigation/discovery reveals a more appropriate and broader time period during which LFG stock was an imprudent investment option for the Plan.

"Class Period") and whose Plan accounts included investments in LFG common stock.

43.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are at least one thousand members of the Class who participated in, or were beneficiaries of, the Plan during the Class Period and whose Plan accounts included investment in LFG Stock.[3]

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

  (a)     whether Defendants each owed a fiduciary duty to the Plan, Plaintiff and members of the Class;

  (b)     whether Defendants breached their fiduciary duties to the Plan, Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

  (c)     whether Defendants violated ERISA; and

  (d)     whether the Plan and members of the Class have sustained damages and, if so, what is the proper measure of damages.

45.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions, complex, and

---

[3]   According to the 2008 Form 5500 filed on behalf of the Plan there were approximately 10,000 Plan participants as of December 31, 2008.

12

ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Plan or the Class.

47.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

48.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## DEFENDANTS' FIDUCIARY STATUS

49.     During the Class Period, upon information and belief, each Defendant was a fiduciary of the Plan, either as a named fiduciary or as a *de facto* fiduciary with discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

50.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

51.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any

authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

52.     Each of the Defendants was a fiduciary -- either as a named fiduciary or *de facto* fiduciary -- with respect to the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the Plan documents, through their conduct, and under ERISA.

53.     As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

54.     Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

55.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company chose to assign the appointment and removal of fiduciaries, such as the members of the Employee Benefits Committee, to itself.

14

56.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants and beneficiaries, not in the interest of the Plan sponsor.

57.    During the Class Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section

**Director Defendants' Fiduciary Status**

58.    As described above, each of the Director Defendants served as a director of LFG during the Class Period.

59.    The Director Defendants had primary oversight of the Plan.   The Director Defendants were responsible for appointing, monitoring and, if necessary, removing members of the Employee Benefits Committee, as well as other officers/employees' who had been delegated duties with respect to the administration/management of the Plan and management of the Plan's assets.  *See, e.g.*, 2008 Form 11-K ("[o]verall responsibility for administering the Plan rests with the Benefits Committee appointed by the Board of Directors of the Company").

60.    The Board's Investment Funds Committee was responsible for establishing the investment policy and monitoring the performance of the Company's pension and portfolio investments, including, upon information and belief, the Plan's investment in Company stock. *See* LandAmerica Financial Group, Inc., Definitive Proxy Statement (Form DEF 14A), at 14 (March 23, 2008).

61.    The Board's Executive Compensation Committee's responsibilities included reviewing significant changes to the Company's benefit plans, including, upon information and belief, the Plan. *See Id.* at 12.

15

62. The Board's Executive Committee had the authority to act for the Board on most matters during the intervals between Board meetings. *See Id.* at 11.

63. Upon information and belief, the Board collectively retained responsibility for the actions of the Investment Funds Committee and Executive Compensation Committee, as these were committees of the Board.

64. The Director Defendants were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

## Employee Benefits Committee's Fiduciary Status

65. The Employee Benefits Committee, a group of Company officers/employees appointed by the Board, bore overall responsibility for administering the Plan. *See* 2008 Form 11-K.

66. Upon information and belief, the Employee Benefits Committee was delegated the day-to-day responsibility for the administration of the Plan and the management of the Plan's assets and was likely a named fiduciary of the Plan.

67. The members of the Employee Benefit Committee were fiduciaries of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority with respect to the management and administration of the Plan and/or management and disposition of the Plan's assets.

## Additional Fiduciary Aspects of Defendants' Actions/Inactions

68. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, *i.e.*, performed fiduciary functions. ERISA § 3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i), provides that a person is

a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its assets . . . ." During the Class Period, Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

69.     ERISA mandates that pension plan fiduciaries have a duty of loyalty to the Plan and its participants which includes the duty to speak truthfully to the Plan and its participants when communicating with them.  A fiduciary's duty of loyalty to plan participants under ERISA includes an obligation not to materially mislead, or knowingly allow others to materially mislead, plan participants and beneficiaries.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

70.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate or misleading information so that plan participants will not be injured. *See, e.g.,* *Griggs v. E.I. Dupont de Nemours & Co.*, 237 F.3d 371, 381 (4th Cir. 2001) ("[An] ERISA fiduciary that knows or should have known that a beneficiary labors under a material misunderstanding of plan benefits that will inure to his detriment cannot remain silent – especially when that misunderstanding was fostered by fiduciary's own material representations or omissions.").

71.     During the Class Period, upon information and belief, the Company made direct and indirect communications with the Plan's participants including statements regarding investments in Company stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including Summary Plan Descriptions ("SPDs") and/or prospectuses regarding Plan/participant holdings of Company

stock), which included and/or reiterated these statements. Upon information and belief, at all times during the Class Period, LFG's SEC filings were incorporated into and part of such SPDs and/or a prospectuses. Thus, Defendants also acted as fiduciaries to the extent of their communications with Plan participants.

72.    Further, Defendants, as the Plan's fiduciaries, knew or should have known certain basic facts about the characteristics and behavior of the Plan's participants, well-recognized in the 401(k) literature and the trade press[4] concerning investment in company stock, including that:

(a)    Employees tend to interpret a match in company stock as an endorsement of the company and its stock;

(b)    Out of loyalty, employees tend to invest in company stock;

(c)    Employees tend to over-extrapolate from recent returns, expecting high returns to continue or increase going forward;

(d)    Employees tend not to change their investment option allocations in the plan once made;

(e)    No qualified retirement professional would advise rank and file employees to invest more than a modest amount of retirement savings in company

---

[4]  *See, e.g.,* David K. Randall, *Danger in Your 401(k),* Forbes.com (August 30, 2010) (available at: http://www.forbes.com/forbes/2010/0830/health-retirement-savings-erisa-danger-in-401k_print.html); Liz Pulliam Weston, *7 Ways to Mess Up Your 401(k),* MSN.com (December 31, 2007) (available at: http://articles.moneycentral.msn.com/RetirementandWills/InvestForRetirement/7MostCommon401kBlunders.aspx); Joanne Sammer, *Managed Accounts: A new direction for 401(k) plans,* Journal of Accountancy, Vol. 204, No. 2 (August 2007) (available at: http://www.aicpa.org/pubs/jofa/aug2007/sammer.htm); Roland Jones, *How Americans Mess Up Their 401(k)s,* MSNBC.com (June 20, 2006) (available at: http://www.msnbc.msn.com/id/12976549/) ; Bridgitte C. Mandrian and Dennis F. Shea, *The Power of Suggestion: Inertia in 401(k) Participation and Savings Behavior,* 116 Q. J. Econ. 4, 1149 (2001) (available at: http://mitpress.mit.edu/journals/pdf/qjec_116_04_1149_0.pdf); Nellie Liang & Scott Weisbenner, 2002, *Investor behavior and the purchase of company stock in 401(k) plan - the importance of plan design,* Finance and Economics Discussion Series 2002-36, Board of Governors of the Federal Reserve System (U.S.) (available at: http://www.federalreserve.gov/pubs/feds/2002/200236/200236pap.pdf).

18

stock, and many retirement professionals would advise employees to avoid investment in company stock entirely;

(f)     Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(g)     Even for risk-tolerant investors, the risks inherent to company stock are not commensurate with its rewards.

73.     Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's funds in Company Stock, they still took no action to protect the Plan's assets from their imprudent investment in Company Stock.

## FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES[5]

### A.     Introduction

74.     As described in detail herein, "the story of LandAmerica is about the illusion of safety." *See* Chris Adams, *LandAmerica Touted its Safety but Clients Lost Millions*, McClatchy Washington Bureau (March 20, 2010), available at:

http://www.mcclatchydc.com/2010/03/20/90665/landamerica-touted-its-safety.html.

75.     Throughout the Class Period, LFG was a holding company that operated through its various regulated and unregulated subsidiaries. One of the businesses that LFG operated was a title insurance business.

---

[5] The allegations made in this Complaint are based on information and belief, based on the ongoing investigation conducted by Plaintiff's attorneys. The allegations have further evidentiary support found in the record developed in bankruptcy litigation, captioned: *In re LandAmerica Financial Group, et al.*, Case No. 08-35994, (E.D. VA), as well as the Second Amended Consolidated Complaint filed in consolidated civil actions pending against SunTrust Bank, Defendants Chandler and Evans and several other former employees of LFG and LES, captioned: *In re: LandAmerica 1031 Exchange Services, Inc., Internal Revenue Service § 1031 Tax Deferred Exchange Litigation*, Case No. MDL No. 2054 (D. SC) (referred to herein as the "1031 Exchange Litigation Complaint").

76.     LFG issued title insurance policies primarily through two principal title underwriting subsidiaries: Commonwealth Land Title Insurance Company and Lawyers Title Insurance Corporation. LFG also owned two other title insurance underwriters: Commonwealth Land Title Insurance Company of New Jersey and United Capital Title Insurance Company. LFG's products and services facilitated the purchase, sale, transfer and financing of residential and commercial real estate. At one point, LFG was the nation's third largest provider of title insurance services.

77.     Title insurance is involved in virtually every mortgage transaction. Generally, the two most common types of title insurance policies are "lender" or "mortgagee" policies, which protect lenders, and "owner policies," which protect property buyers.

78.     Title insurance business is closely related to the overall level of residential and commercial real estate activity, which generally is affected by the relative strength or weakness of the United States economy. In addition, title insurance volumes fluctuate based on changes in interest rates and the availability of mortgage financing. Accordingly, LFG's title insurance operations thrived during the explosive growth period created by the subprime mortgage industry. From essentially zero in 1993, subprime mortgage originations grew to $625 billion by 2005, one-fifth of total mortgage originations in that year, a 26 percent annual rate of increase over the whole period, creating approximately 12 million new homeowners and raising the overall homeownership rate in the United States from 64 percent to 69 percent. *See* Edward M. Gramlich, *Booms and Busts: The Case of Subprime Mortgages*, Kansas City Federal Reserve Economic Review 2007, available at:

http://www.kansascityfed.org/PUBLICAT/ECONREV/PDF/4q07Gramlich.pdf.

79.     However, as periods of increasing interest rates and reduced mortgage financing availability usually have an adverse effect on residential real estate activity, LFG's title insurance operations suffered a debilitating setback during 2007 and 2008, due to the tremendous drop in mortgage transactions and the increase in claims losses that accompanied the collapse of the subprime mortgage industry. *See, e.g.,* Chad Eric Watt, *Real Estate Market Slump Slams Title Companies*, Dallas Business Journal (August 17, 2008), available at:

http://www.bizjournals.com/dallas/stories/2008/08/18/story13.html.

80.     However, title insurance was not LFG's only line of business.  In addition to its title insurance operations, LFG operated a very profitable 1031 Exchange service through wholly-owned subsidiary LES.  LES operated as a "qualified intermediary" under Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031(a) ("Section 1031"), (further described below) for like-kind property exchanges.  According to an internal company document, LES was a "high margin business with greater than 50 percent profit margins." *See* Adams, *supra.*

81.     Generally, taxes are incurred when property is sold or transferred and a gain is realized on the transaction.  However, Section 1031 permits a seller of investment property to defer the payment of capital gains taxes on the proceeds of the sale by using those proceeds to purchase "like-kind" replacement property. *See Like-Kind Exchanges Under IRC Code Section 1031*, IRS.gov (February 18, 2008) available at:

http://www.irs.gov/newsroom/article/0,,id=179801,00.html ("Like  Kind  Exchanges").     The business of Like Kind Exchanges may be graphically depicted as follows:



Source: *Investment Property Central*, available at: http://investmentpropertycentral.org/what-is-a-1031-exchange/.

82.    As further described below, as a qualified intermediary, LES held hundreds of millions of dollars for taxpayers seeking to avoid paying capital gains taxes upon the sale of real estate by purchasing like-kind properties with the net proceeds from the sales. However, rather than hold the funds in a safe account insured by the Federal Deposit Insurance Corporation ("FDIC"), as it was obligated to do, LES imprudently invested the funds in auction rate securities, an investment with an inherent liquidity risk.

83.    Following the February 2008 collapse of the auction rate securities market, LES was severely impacted, which in turn gravely affected the Company as it found itself trapped in a desperate liquidity crisis and on a collision course with failure. However, as described below,

the Company concealed the truth concerning its condition and continued to engage in improper conduct until its demise in November 2008.

84.    Throughout the Class Period, Defendants knew or should have known that LFG stock was an imprudent Plan investment, because, as further described herein: (a) LFG's title insurance operations were devastated by the collapse of the subprime mortgage industry; (b) LFG was exposed to the inherently risky practices of LES, which imprudently gambled its survival upon the stability of the auction rate securities market; (c) LFG concealed the truth concerning its rapidly deteriorating condition and the impact of the frozen auction rate securities market on its ability to continue as a going concern; and (d) as a consequence of the above, significant investment of employees' retirement savings in Company Stock would inevitably result in substantial losses to the Plan and, consequently, to the Plan's participants.

85.    Defendants could not have acted prudently when they continued to permit the Plan to invest in Company Stock and maintained the Plan's existing investments in Company Stock. As a consequence of the below-described facts, Defendants knew or should have known that Company Stock was an imprudent investment for the Plan.

86.    However, their fiduciary duties notwithstanding, Defendants failed to protect the Plan participants' retirement savings from being imprudently invested in Company stock, and as a result, the Plan, and ultimately its participants, suffered losses. A prudent fiduciary, facing similar circumstances, would not have stood idly by as the Plan essentially lost its entire investment in Company Stock.

**B.    LFG's Title Insurance Operations and 1031 Exchange Business Thrived during the Boom Created by the Subprime Mortgage Industry**

87.    Subprime mortgage lending began to expand significantly in the late 1990s. As subprime mortgages became increasingly popular among investors on the secondary market,

lenders had an increased incentive to increase their volume of such risky loans.   Indeed, subprime lending soared from $150 billion in 2000 to $650 million in 2005. *See Could Tremors in the Subprime Mortgage Market Be the First Signs of an Earthquake?*, Knowledge@Wharton (February 21, 2007), available at:

http://knowledge.wharton.upenn.edu/article.cfm?articleid=1664 ("Tremors").

88.     LFG's title insurance business was heavily dependent upon a high volume of real estate transactions.   *See* LandAmerica Financial Group, Inc., Current Report (Form 8-K), Exhibit 99.1 (February 28, 2008) ("The demand for our title insurance products and services is dependent upon, among other things, the volume of residential and commercial real estate transactions, including mortgage refinancing transactions."). This is because, unlike other forms of insurance, title insurance does not involve the payment of annual premiums. Rather, a title insurer receives a one-time premium at the time the policy is issued. Subsequently, the title insurer must provide coverage until there is a transfer of title to the property or the mortgage on the property is paid in full (or refinanced). *See* Suzanne M. Garcia, *A Glance at the Impact of the Subprime Mortgage Crisis on the Title Insurance Industry*, 30 Pace L. Rev. 233, 235-236 (2009), available at: http://digitalcommons.pace.edu/plr/vol30/iss1/19.

89.     As virtually every residential mortgage transaction involves a title insurer, LFG's business benefited greatly from the increased volume of purchase and refinance loans in the subprime sector.

90.     The housing boom and the willingness of lenders to enter into mortgage financing transactions were also good for LFG's 1031 Exchange business.   Section 1031 requires a seller to identify such like-kind replacement property within 45 days from the date of the sale of the original investment property and provides that the seller has 180 days within

which to close on the purchase of replacement property. If the transaction is not properly completed within these time periods, the seller loses the Section 1031 tax benefit. *See Like Kind Exchanges, supra.*

91. However, Section 1031 prohibits the seller from taking possession of the proceeds of the sale of investment property. As a means of preserving the tax benefit for the seller, Section 1031 permits the seller to use a "safe harbor." One such safe harbor provides that the seller may use a qualified intermediary to receive and hold the proceeds until the seller is ready to close on the replacement property. *See Id.*

92. During the course of its operations, LES entered into agreements (each a "1031 Agreement") with its customers whereby it agreed to act as a qualified intermediary to qualify for the 1031 tax benefit. LES agreed to act on behalf of its customers exclusively for the purpose of facilitating their exchange of the relinquished property for the replacement property.

93. LES's customers transferred legal title to the Exchange Funds to be held by LES in trust for their benefit for no more than 180 days. LES conveyed no consideration to its customers for receipt of the net proceeds of the sales ("Exchange Funds"), except nominal, below-market earnings and the promise to keep the Exchange Funds safe and available for the purchase of replacement property.

94. Pursuant to the 1031 Agreements, LES would acquire the net proceeds of the sales of relinquished properties in accordance with requirements of the Internal Revenue Code in order to facilitate a like-kind exchange. Upon information and belief, the 1031 Agreements stated that LES was to hold the Exchange Funds only until the 1031 Exchanges were complete or until the expiration of the statutory time periods within which to identify and acquire replacement properties.

95.     At the closing on the replacement property, in accordance with the 1031 Agreement, LES was to transfer the Exchange Funds to the seller of the like-kind replacement property. Subsequently, title to the replacement property was to be transferred to the taxpayer.

96.     LES earned income from fees charged to its customers and the spread between the interest earned by LES on the Exchange Funds and the guaranteed rate paid to its customers in accordance with the 1031 Agreements. *See* 1031 Exchange Litigation Complaint, at ¶ 76. The 1031 Agreements specified that the Exchange Funds would be deposited in an FDIC-insured account at SunTrust Bank in Richmond, Virginia. LES's purported standard practice was to place Exchange Funds into a money market account known as the SunTrust 3318 account. LES's investment and treasury activities were carried out through transfers in and out *of* this account. Authorized disbursements from the SunTrust 3318 account included only the funding of replacement property purchases and repayment of Exchange Funds to taxpayers who did not identify or purchase replacement property. *See Id*, at ¶¶ 64-68.,

**C.     By early 2008, however, LFG Was in a Precarious Position, as the Collapse of the Subprime Mortgage Industry and the Overall Decline in the Housing Market Had Severely Weakened its Title Insurance Operations and its 1031 Exchange Business was Exposed to a Devastating Liquidity Crisis**

**a.     The Subprime Mortgage Industry Collapsed, Leaving LFG's Title Operations Facing Decreasing Revenue and Increasing Claims Losses**

97.     LFG's ability to rely upon a high volume of subprime mortgage transactions and the overall growth of the real estate market would not last. This is because many subprime mortgage loans were made to risky borrowers; and on terms on which many borrowers could not afford. By the end of 2006, a perfect storm was brewing. Billions of dollars in risky subprime mortgage loans had been made to borrowers who could barely afford to pay their monthly mortgage notes. At the same time, housing prices were falling and interest rates were rising. *See* Tremors, *supra.*

26

98.    As home prices declined and interest rates began to rise, the default rates for these mortgages rose as well and had a debilitating impact upon the mortgage market. *See, e.g.,* Joe Niedzielski, *A Sinking Sensation for Subprime Loans,* Standard & Poor's Equity Research (February 14, 2007), available at

http://www.businessweek.com/investor/content/feb2007/pi20070214_954191.htm.

99.    Further, in 2006, many subprime mortgages began to reset from low teaser interest rates to substantially higher variable rates. The confluence of the resetting of subprime mortgages to higher rates, falling housing prices and the rise in interest rates effectively left many borrowers living in homes they clearly could not afford and could not refinance, which, in turn, led to increased foreclosures.

100.    As the nation's third largest title insurer, LFG's title insurance business was heavily impacted by the tremendous problems in the subprime mortgage lending market and the ultimate decline in the real estate market as a whole. Specifically, the collapse of the subprime mortgage industry led to a decline in premium volume and an increase in claims. *See* Garcia, *supra.*

101.    The substantial decline in mortgage financing transactions that accompanied the subprime mortgage crisis meant a substantial drop in premium income for LFG. Additionally, simultaneously as LFG's premium volume decreased, its exposure to claims losses increased. *See, e.g.,* Garcia, *supra* ("at the same time as business was plummeting, title insurance claims were rising beyond all expectations"). As the subprime mortgage industry collapsed,

> Some of the reasons advanced for the increase in claims [were] the large number of foreclosures, fraud claims, losses from home equity insurance products and agent defalcations...As mortgages went into default, underlying title issues began to surface and claims blossomed.

*See* Garcia, *supra,* at 239.

102.   The subprime mortgage crisis and the overall decline in the housing market therefore adversely impacted LFG's title insurance business activities and liquidity.  In fact, the drop in premium income and increase in claims reduced LFG's revenues by over 40% from the fourth quarter of 2006 to the third quarter of 2008 and caused the Company's provision for policy losses to increase from 5.2% of operating revenue for 2005 to 23.5% of operating revenue for third quarter 2008.  *See* Diana Golobay, *LandAmerica Posts $600 Million Q3 Net Loss* (November 10, 2008), available at:

http://www.housingwire.com/2008/11/10/landamerica-posts-600-million-3q-net-loss; *see also* LandAmerica Financial Group, Inc., Annual Report (Form 10-K), at 37 (March 9, 2006).

103.   LFG as a whole was severely weakened by the collapse of the subprime mortgage industry.  When LFG announced its second quarter 2007 financial results on August 1, 2007, the Company reported that its pretax income decreased by $45.7 million in second quarter 2007 from second quarter 2006, due to weakness in the residential housing market and the increase in its claims provision of $34.3 million.  LFG noted that, according to the Mortgage Bankers Association, total residential mortgage originations decreased by approximately $20 billion from the prior year period.  *See* LandAmerica Financial Group, Inc., Current Report (Form 8-K), Exhibit 99.1 (August 1, 2007).  The market was not pleased.  Following this announcement, the Company's stock price plunged $12.70 per share from $76.59 to $63.89, or 16.58% from the previous close.

        b.    **The LFG's 1031 Exchange Business was Subject to a Devastating Liquidity Crisis, due to the Company's Mismanagement of Exchange Funds and its Imprudent Investment of Exchange Funds in Auction Rate Securities**

104.   Upon information and belief, LES failed to segregate the Exchange Funds from LES's own funds and, rather, improperly used the SunTrust 3318 account generally as its own

operating account, in violation of the Federation of Exchange Accommodators ("FEA") Code of Ethics. *See* 1031 Exchange Litigation Complaint, at ¶ 67; *see also* Federation of Exchange Accommodators Code of Ethics, Article VI.A.(a)1., available at: http://www.1031.org/aboutFEA/ethics.htm.

105.    For instance, upon information and belief, LES engaged in numerous unauthorized transfers out of the SunTrust 3318 account, including transfers to investment accounts at SunTrust for investment and treasury activities, the purchase of investment vehicles, funding of LES's operational charges such as payroll, funding dividends to LFG, and funding of unrelated prior exchanges due to LES's liquidity problems. *See* 1031 Exchange Litigation Complaint, at ¶ 69.

106.    Further, contrary to its contractual obligation to deposit the Exchange Funds into an FDIC-insured SunTrust account, LES, in an attempt to increase its own revenue streams, invested the Exchange Funds in a number of investment vehicles, including imprudent vehicles known as auction rate securities. LES's investment in auction rate securities was intended by LES to earn more interest and therefore, more profit for LES, and ultimately its parent, LFG.

107.    However, LES's imprudent investment of Exchange Funds in auction rate securities eventually led to LFG's demise because auction rate securities were not appropriate cash management vehicles.

108.    Auction rate securities are taxable and tax-exempt long-term bonds with interest rates tied to the short-term market. Rates on these securities are reset on a periodic basis (e.g. every 7, 28 or 35 days) in a Dutch Auction process, through which new investors bid to purchase the securities from existing holders, as depicted below:



*Source*: WSJ Reporting.

109.    Auction rate securities were substantially different than money market funds and traditional investments like CD's, Treasury Bills, commercial paper and agency discount notes. For instance, because individual money market instruments have an established secondary market, investors wishing to liquidate such securities have the ability to solicit bids from multiple dealers.  In contrast, holders of auction rate securities own an illiquid security between auction dates and in the event of a failed auction.  Additionally, trades can only be processed by the auction agent and not the broader market. *See Auction Rate Securities: Understanding the Risks*, McQueen Financial Advisors (dated February 1, 2007, originally published February 8, 2007), available at: http://www.m-f-a.com/ARS.pdf.

110.    LES chose to gamble its ability to sustain its business model on the stability of the auction rate securities market.  However, the liquidity of the auction rate securities market was wholly dependent upon the success of the auctions, which was, in turn, dependent upon the existence of a market of buyers willing to purchase these investment vehicles. *See Id.* (noting, "We have **never** recommended auction rate securities because they lack some important fundamental characteristics") (emphasis added).

111.    There was an inherent liquidity risk associated with the auction rate securities market, numerous signs of which should have been known by LES and LFG well in advance of 2008.

112.    According to the Congressional Research Service, the auction rate securities market began to show signs of stress as early as 2003. *See* Adams, *supra*.

113.    As least as early as 2004, some industry insiders were warning of the liquidity risks presented associated with auction rate securities and warning investors to avoid confusing them with cash equivalents. *See, e.g.* Herb Greenberg, *Auction-rate Warnings Fell on Deaf Ears*, Wall Street Journal (March 9, 2008), available at:

http://www.marketwatch.com/story/auction-rate-warnings-fell-on-deaf-ears (noting that SVB Asset Management portfolio manager Joe Morgan began warning corporate clients as early as 2004 to steer clear of auction-rate securities as cash equivalents); *see also* Lance Pan, "*Forecasting a Perfect Storm: New Developments Aggravate the Potential Fall of the Auction Rate Securities Market*," Capital Advisors Group Research Newsletter, Mar 1, 2005, available at [http://www.capitaladvisors.com/pdf/Forecasting_a_Perfect_Storm.pdf].

114.    At least as early as 2005, major accounting firms required their clients to reclassify auction rate securities as more risky forms of "investments" rather than cash equivalents on corporate financial reports. *See* Adams, *supra*; *see also Auction Rate Securities: Know the Risks and Rewards*, SVB Financial Group (August 15, 2007), attached hereto as Exhibit B (noting that Big Four accounting firms had required their clients to reclassify auction rate securities from cash equivalents to short-term, and in some cases, long-term holdings).

115.    In March 2007, the Financial Accounting Standards Board ("FASB") required that auction rate securities had to be listed on balance sheets as short-term investments rather

than as cash equivalents. *See* Marie Leone, *FASB Moves to Nix Cash Equivalents* (March 22, 2007), available at: http://www.cfo.com/printable/article.cfm/8907237.

116.    According to the Congressional Research Service, by 2007, "most sophisticated investors and corporate cash managers were well aware of issues concerning the auction-rate market." *See* Adams, *supra*.

117.    In a publication dated August 15, 2007, SVB Financial Group issued the following warning:

> We continue to recommend that investors be fully aware of the auction process and its reliance on a restrictive trading structure. Because investors in the short-term space generally require a high degree of liquidity as a prerequisite for any investment, it is important to invest in securities where a broad array of brokers can provide liquidity. Under the typical auction rate structure, there is a great degree of dependency upon a single broker who oversees the auction process. Until this asset class provides more complete trading options and less accounting risk, we believe the slight yield advantage available today does not merit the inherent risks described above.

*See Auction Rate Securities: Know the Risks and Rewards, supra.*

118.    In August and in September 2007, over 60 of the auctions that set interest rates for auction rate securities failed. See Adams, supra.

119.    Notwithstanding the liquidity crisis that it would face in the event of a collapse of the auction rate securities market, LES maintained its investment of Exchange Funds in auction rate securities.   Accordingly, LFG's 1031 Exchange business was exposed to a devastating liquidity crisis in the event that the auctions failed.

**D.    Due to the Problems Within its Title Insurance Operations and its Gamble with Respect to Auction Rate Securities, LFG Could Not Survive if the Auctions Failed**

120.    By the beginning of 2008, due to the devastating impact of the subprime mortgage crisis upon its title insurance business, LFG found itself in a substantial weakened

position. Its stock price was $32 per share, down from $63 per share on January 1, 2007 – representing a drop of almost **50%** over the course of 2007. At this time, on January 1, 2008, the Plan held 812,908 shares of LFG common stock, then valued at approximately $28,418,994. *See* 2008 Form 11-K.

121. By the beginning of 2008, facing decreasing revenue and increasing claims-related losses in its title insurance operations, LFG simply could not afford to lose the profitability and stability of its successful 1031 Exchange business.

122. This is exactly what occurred on February 13, 2008, when approximately 1,000 auctions failed. *See* Jenny Anderson and Vikas Bajaj, *New Trouble in Auction-Rate Securities*, New York Times (February 15, 2008), available at:

http://www.nytimes.com/2008/02/15/business/15place.html.

123. Essentially, the auctions froze after potential buyers declined to bid on the securities. Ultimately, the markets collapsed and the LES's investments of Exchange Funds in auction rate securities became illiquid. As a result, LES began to encounter extreme difficulty meeting its obligations to fund the replacement properties of its customers.

124. LES's exposure to the auction rate securities market was gargantuan. In fact, in February 2008, when the auction rate securities market came to a standstill, LES had more than **$200 million** of Exchange Funds invested in auction rate securities. After the auctions failed in February 2008, LES experienced a devastating decline in 1031 Fund inflows, while remaining obligated to meet redemptions for older transactions. *See* Emily C. Dooley, *Files Detail LandAmerica Money Woes*, Richmond Times Dispatch (August 1, 2009), available at: http://www2.timesdispatch.com/member-center/share-this/print/?content=ar35456.

125.    Certainly by the time the auction rate securities market collapsed in February 2008 (if not earlier), due to LES's liquidity crisis, coupled with the Company's already-precarious position due to the severe downturn in its title insurance operations, Defendants knew or should have known that LFG stock was an imprudent Plan investment, yet took no action whatsoever.

**E.      Rather than Face the Truth, LFG Took Desperate Measures to Maintain its "Illusion of Safety" Until the Very End**

126.    As one author observed, "LandAmerica basically had a bank account it couldn't access, but it didn't warn its customers." *See* Adams, *supra.* Likewise, Defendants took no action whatsoever to protect the Plan and its participants.

127.    In March 2008, just one month after the collapse of the auction rate securities market, LFG issued a promotional sheet entitled "The Financial Stability of LandAmerica." Among other things, the promotional document assured clients that LFG did not engage in risky investments and that a top accounting firm regularly reviewed the soundness, sufficiency and performance of LFG's various investments. *See* Adams, *supra.*

128.    On April 29, 2008, LFG's stock closed at $35.76 per share. However, after the market closed, the Company released its first quarter 2008 Form 10-Q earnings report. Therein, citing lower residential mortgage originations and a fall in commercial revenue, LFG announced a loss of $24.2 million, or $1.60 a share, compared with earnings of $4.7 million, or 26 cents a share, during the prior year period. This was highly disappointing to investors and in sharp contrast to analysts' expectations of a loss of 49 cents per share. *See* LandAmerica Financial Group, Inc., Quarterly Report (Form 10-Q), at 18 (April 29, 2008).

129.    Also on April 29, 2008, however, LFG blatantly denied that the frozen auction rate securities market would have any material impact upon the Company's financial condition, stating:

> We believe the failures of these auctions do not affect the value of the collateral underlying the auction rate securities and we continue to earn and receive interest on our auction rate securities at contractually set rates.
>
> However, we have liquidity exposure to these securities to the extent that we would be required to utilize these securities to satisfy the purchase of properties. **Based on the credit quality of the underlying securities and the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position or results of operations.**

*See Id.* at 18 (emphasis added).    Following these announcements, on April 30, 2008, the Company's stock plummeted to $28.70 per share, from a close of $35.76 on April 29, 2008.

130.    Meanwhile, in response to the collapse of the auction rate securities market and the overall decline in LFG's title insurance operations, on June 30, 2008, SunTrust Bank executed a Second Amendment to its Revolving Credit Agreement (the "Second Amendment") with LFG, reducing the principal amount available under the facility from $200 million to $150 million.    *See* LandAmerica Financial Group, Inc., Current Report (Form 8-K) (July 7, 2008). Additionally, the Second Amendment provided arrangements for SunTrust to be able to file proofs of claim as Administrative Agent on behalf of all lenders[6] in the event of LFG's bankruptcy.    *See* Second Amendment (attached as Exhibit C hereto), § 9.11.

131.    On July 25, 2008, Standard & Poor's placed LFG's counterparty credit rating and the counterparty credit and financial strength rating of the Company's title insurance

---

[6] These additional lenders included Wachovia Bank, N.A., Comerica Bank, Wells Fargo Bank Arizona, N.A., PNC Bank, N.A., Bank of America, N.A., JPMorgan Chase Bank, N.A., US Bank, N.A. and Union Bank of California, N.A. *See* Second Amendment.

operations on "CreditWatch" with negative implications. *See* LandAmerica Financial Group, Inc., Quarterly Report (Form 10-Q), at 36 (July 30, 2008).

132.   During the summer of 2008, LFG continued to conceal the truth concerning its financial condition. Notably, even after LFG posted its fourth consecutive loss on July 29, 2008 ($50 million loss), Defendant Chandler glossed over the Company's true financial troubles, stating, "We have clearly demonstrated our ability to take out significant costs while improving our competitive position." *See* LandAmerica Financial Group, Inc., Current Report (Form 8-K), Exhibit 99.1 (July 30, 2008).   The Company also stated that it was "unlikely" the Company would need to provide liquidity to the Exchange Funds and that, "[b]ased on the amount of funds we have historically held, we believe the risk of loss will not have a material adverse effect on our financial position." *See* LandAmerica Financial Group, Inc., Quarterly Report (Form 10-Q), at 20 (July 30, 2008).

133.   Despite these representations, during the third and fourth quarters of 2008, LFG transferred $20 million and $45 million, respectively to LES to close exchanges and keep the SunTrust 3318 account from being overdrawn. *See* LandAmerica Financial Group, Inc., Quarterly Report (Form 10-Q), at 36-37 (November 10, 2008).   These payments served to conceal LES's illiquidity from new clients, who continued entering into new 1031 Agreements with LES.

134.   Even as LES struggled with liquidity and spiraled toward its demise, it pretended that all was well and continued to solicit and accept Exchange Funds into November 2008.  In a desperate struggle to stay afloat, LES engaged in what has been referred by some as a "Ponzi scheme." *See, e.g.*, Dave Ress, *LandAmerica Knew End Was Near, Clients Say*, Richmond Times-Dispatch (September 12, 2009).  In order to continue its operations and continue its

illusion of stability, despite its knowledge of the frozen auction rate securities market and its own capital crises, LES continued to accept Exchange Funds and solicit new clients throughout 2008 in order to procure additional Exchange Funds, which were ultimately misappropriated by LES to fund prior 1031 Exchange transactions.

135.   Rather than "holding" these additional Exchange Funds for the benefit of the new clients, LES spent the money as it was received to meet its obligations to other clients. LES was relying on the incoming cash from new exchanges to fund prior exchanges that were pending, but unfunded due to the frozen auction rate securities market. This was clearly improper.   As one aggrieved customer later observed, "That dog shouldn't have hunted anymore." *See* Alex Frangos, *LandAmerica's Collapse Leaves Investors Looking For Cash*, Wall Street Journal (December 2, 2008), available at: http://www.marketwatch.com/story/landamericas-collapse-leaves-investors-looking-for-cash-2008-12-02 (quoting Larry Madison of Madison Heights, Michigan).

136.   By October 2008, as a result of the severe downturn in the housing and mortgage markets and its gargantuan exposure to the auction rate securities market, LFG had defaulted on the covenants contained in its loans from SunTrust. As the Company later described in its third quarter 2008 earnings report:

> The covenant violations, unless waived by the lenders, constitute an event of default under the agreements, giving the lenders the right to declare all principal and accrued interest payable immediately, and exercise other rights and remedies granted under the agreements. A declaration for immediate payment under either of these agreements also would constitute an event of default under our convertible note obligations, enabling the holders of such indebtedness to require the immediate payment of such obligations.

* * *

> The effects of the severe downturn in the housing and mortgage markets also caused us to violate the financial debt covenants of our Note Purchase Agreement and our Credit Agreement as of September 30, 2008. We do not have access to the undrawn $50.0 million commitment amount remaining under the Credit Agreement as long as an event of default has occurred and is continuing. In addition, based on current projections, we are likely to not be in compliance with the financial covenants of these agreements as of December 31, 2008.

*See* LandAmerica Financial Group, Inc., Quarterly Report (Form 10-Q), at 10-11 (November 10, 2008).

137.   On October 1, 2008, LFG's Investment Funds Committee held a meeting to discuss the situation regarding deficits of LES and its inability to satisfy its commitments without an influx of capital.   During the meeting, Investment Funds Committee members learned there would be no new loan from SunTrust and that a potential agreement with Citigroup was "less than desirable." *See* Adams, *supra*.

138.   On October 6, 2008, a senior executive of LFG acknowledged the dire circumstances surrounding LES in correspondence to a state insurance regulator acknowledging that, without either an infusion of new capital or the substitution of liquid assets for its auction rate securities, LES may not be able to meet its obligations in the near future. *See* Adams, *supra*.

139.   Despite this acknowledgment, however, LES continued to solicit and accept new Exchange Funds. As one author described LandAmerica's elaborate deception:

> Even after the market collapsed, LandAmerica continued to say that its services were safe. Beyond that, after warning the U.S. Treasury Department that "hundreds of innocent businesses and individuals will be needlessly harmed" if the company didn't get help, LandAmerica continued to collect customers' money.

*See* Adams, *supra*.  Meanwhile, LFG's stock price continued its decline and closed at $19.96 a share.

140. By letter dated October 20, 2008, Defendant Chandler requested a meeting with U.S. Treasury Secretary Henry Paulson to seek liquidity assistance. This letter requested immediate financial assistance from the federal government and detailed the Company's inability to sell its $290 million holdings of formerly liquid auction rate securities. *See* Letter from Theodore L. Chandler, Jr., Chairman and CEO, LandAmerica Financial Group, Inc. to Henry M. Paulson, Jr., Secretary, Department of the Treasury (October 20, 2008), available at: http://www.richmondbizsense.com/images/lettertotreasury.pdf.

141. On November 7, 2008, LFG issued a press release announcing it entered into a definitive merger agreement with Fidelity National Financial, Inc. ("Fidelity"), whereby Fidelity was to acquire LFG. Under the terms of the merger agreement, LFG shareholders would receive 0.993 shares of Fidelity common stock for each share of LFG common stock. *See* Matt Carter, *Fidelity, LandAmerica Agree to Merger*, Inman News (November 7, 2008), available at: http://www.inman.com/news/2008/11/7/fidelity-landamerica-agree-merger.

142. However, just three days later, on November 10, 2008, LFG announced devastating results for the third quarter 2008. The Company posted a quarter net loss **$599.6 million**.

143. Shockingly, until the very end, the Company continued to accept new Exchange Funds in an attempt to conceal its illiquidity. For example, Santa Paula, California dermatologist Matthew Luxenberg signed his contract with LES on November 14, 2008 and, after receiving assurances from LES that his money was safe, wired $1.4 million to LES on November 21, 2008. *See* Adams, *supra* (describing that Luxenberg sent money to LES on Friday, then was told on Monday that it was gone).

144.   A short while later, on the evening of November 21, 2008, LFG and Fidelity announced that Fidelity had exercised its option to terminate the merger agreement. *See Fidelity Calls Off LandAmerica Merger*, Inman News (November 21, 2008), available at: http://www.inman.com/news/2008/11/21/fidelity-calls-landamerica-merger.   In response to Fidelity's decision, Defendant Chandler remained defiant, stating, "our attention remains focused on strengthening LandAmerica's business during these incredibly difficult economic times. We also continue to explore strategic alternatives to improve shareholder value." *See* LandAmerica Financial Group, Inc., Current Report (Form 8-K), Exhibit 99.1 (November 24, 2008).

145.   Not until November 24, 2008, did LES inform its customers of its desperate situation – by way of letter informing them that it was ceasing operations. *See* Letter from LES to Customers (November 24, 2008), attached as Exhibit D hereto.

146.   This notification predated its announcement of filing for bankruptcy protection by a mere two days. On November 26, 2008, the Company filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code in the Bankruptcy Court of the Eastern District of Virginia, with its stock price down to $0.20 per share.

147.   As described further herein, Defendants, as fiduciaries of the Plan, were obligated to continuously ensure that the Plan's investment alternatives—including LFG common stock—were prudent investments for the Plan's assets. However, Defendants failed to do so—to the substantial detriment of the Plan and its participants.

148.   Since the beginning of the Class Period through LFG's filing for Chapter 11 bankruptcy protection, the Plan's imprudent investments in LFG common stock have been decimated, as indicated below:



*Source:* http:www.seekingalpha.com.

**F.      Defendants Knew or Should Have Known That LFG Common Stock Was An Imprudent Investment For The Plan, Yet Failed To Protect the Plan's Participants**

149.      During the Class Period, although they knew or should have known that Company Stock was an imprudent Plan investment, Defendants did nothing to protect the heavy investment of Plan participants' retirement savings in LFG Stock.

150.      As a result of the enormous erosion of the value of LFG Stock, the Plan's participants, the retirement savings of whom were heavily invested in LFG Stock, suffered unnecessary and unacceptable losses.

151.      Because of their high ranking positions within the Company and/or their status as Plan fiduciaries, Defendants knew or should have known of the existence of the above-mentioned problems.

152.      Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, the Company Stock price would suffer and devastate participants' retirement savings when the truth emerged.   Yet, Defendants failed to protect the Plan and the Plan's participants from these foreseeable losses.

41

153. Rather, during the Class Period, despite their obligation to prudently manage the Plan's assets—including the Plan's heavy investment in LFG Stock—the Company and the Director Defendants failed to disclose the dire circumstances surrounding the Company's true financial condition, thereby precluding Plan's participants from properly assessing the prudence of investing in Company stock. As described above, the Company concealed the truth concerning its financial condition until November 2008.

154. As a result of Defendants' knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification risks that Defendants made to the Plan's participants regarding the Plan's investment in LFG Stock did not effectively inform the Plan's participants of the past, immediate, and future dangers of investing in Company Stock.

155. In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA. Defendants also failed to conduct an appropriate investigation into whether LFG Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan's participants with information regarding LFG's problems so that participants—to the extent that they were permitted—could make informed decisions regarding whether to include LFG Stock in their Plan account.

156. An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in LFG Stock was clearly imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect participants' against unnecessary losses, and would have made different investment decisions.

157. Because Defendants knew or should have known that LFG was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its participants from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in LFG Stock.

158. Defendants had available to them several different options for satisfying this duty, including, among other things: divesting the Plan of LFG Stock; discontinuing further contributions to and/or investment in LFG Stock under the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by LFG they could not loyally serve the Plan and its participants in connection with the Plan's acquisition and holding of LFG Stock; making appropriate public disclosures as necessary; and/or consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the participants of the Plan.

159. Despite the availability of these and other options, Defendants failed to take adequate action to protect participants from losses resulting from the Plan's investment in LFG Stock. In fact, it was not until the Company filed for bankruptcy protection that the option to invest in LFG common stock was suspended. *See* 2008 Form 11-K.

G. **At Least Certain of the Defendants Suffered From Conflicts Of Interest**

160. LFG's SEC filings, including Form DEF 14A Proxy Statements, during the Class Period make clear that a portion of the Director Defendants and certain officers' compensation was in the form of stock awards. *See* LandAmerica Financial Group, Inc., Form DEF-14A (Definitive Proxy Statement) (March 24, 2008).

161. Further, the performance evaluation for certain officers' was a factor in setting their overall compensation. One of the performance indicators for compiling the evaluation was Total Shareholder Return, which was defined as stock price appreciation plus dividends. *Id.*

162.   Because the compensation of at least some of the Defendants was significantly tied to the price of LFG Stock, at least certain of the Defendants had incentive to keep the Plan's assets heavily invested in LFG Stock on a regular, ongoing basis.   Elimination of Company Stock as an investment option/vehicle for the Plan would have reduced the overall market demand for LFG Stock and sent a negative signal to Wall Street analysts; both results would have adversely affected the price of LFG, resulting in reduced compensation for at least certain of the Defendants.

163.   Some Defendants may have had no choice in tying their compensation to LFG Stock (because compensation decisions were out of their hands), but Defendants did have the choice of whether to keep the Plan's participants' and beneficiaries' retirement savings tied up to a large extent in LFG Stock or whether to properly inform participants of material negative information concerning the above-outlined Company problems.

164.   These conflicts of interest put certain of Defendants in the position of having to choose between their own interests as executives and stockholders, and the interests of the Plan participants and beneficiaries, whose interests Defendants were obligated to loyally serve with an "eye single" to the Plan. *See generally Mertens v. Hewitt Assoc.*, 508 U.S. 248, 251-52, 124 L. Ed. 2d 161, 113 S. Ct. 2063 (1993); 29 U.S.C. § 1104(a)(1)(B).

### CLAIMS FOR RELIEF UNDER ERISA

165.   At all relevant times, Defendants were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

166.   ERISA § 502(a)(2), 29 U.S.C. §1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. §1109.

167.   ERISA § 409(a), 29 U.S.C. §1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who

breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

168.     ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), provides, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

169.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982). They entail, among other things:

        (a)    The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

        (b)    A duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

        (c)    A duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows

or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

170.  ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

171.  Plaintiff therefore brings this action under the authority of ERISA §502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA §404(a)(1) and ERISA §405(a).

## COUNT I

### FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §404 AND §405 BY ALL DEFENDANTS)

172.  Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

173.  This Count alleges fiduciary breaches against all Defendants (the "Prudence Defendants").

174. At all relevant times, as alleged above, the Prudence Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

175. Under ERISA, fiduciaries who exercise discretionary authority or control over management of a Plan or disposition of a Plan's assets are responsible for ensuring that all investment options made available to participants under a Plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the Plan are prudently invested. The Prudence Defendants were responsible for ensuring that all investments in the Company's stock in the Plan were prudent. The Prudence Defendants are liable for losses incurred as a result of such investments being imprudent.

176. A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they director who are directed by the plan, including plan trustees, to do so.

177. The Prudence Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing

inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

178. The Prudence Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan. Yet, during the Class Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Plan participants from the inevitable losses that they knew would ensue as the already weakened LFG faced an insurmountable liquidity crisis and spiraled toward its demise, while concealing from the public the truth concerning its predicament.

179. The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Company Stock when they knew or should have known that it was not a suitable and appropriate Plan investment.

180. The Prudence Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and the Company's concealment of the same and, generally, by conveying inaccurate information regarding the Company's future outlook. During the Class Period, upon information and belief, the Company fostered a positive attitude toward Company Stock, and/or allowed participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the prudence of investment in Company Stock. As such, participants in the Plan could not appreciate the true risks presented

by investments in Company Stock and therefore could not make informed decisions regarding their investments in the Plan.

181.    The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures knowingly participating in, or knowingly undertaking to conceal, each other's failure to disclose crucial information regarding the Company's operations and the truth concerning the Company's insurmountable liquidity crisis.  The Prudence Defendants had or should have had knowledge of such breaches by other Plan fiduciaries, yet made no effort to remedy them.

182.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly the Plan's participants and beneficiaries, lost a significant portion of their retirement investment.  Had the Prudence Defendants taken appropriate steps to comply with their fiduciary obligations, participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan.

183.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### BREACH OF DUTY TO AVOID CONFLICTS OF INTEREST
### (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY THE DIRECTOR DEFENDANTS)

184.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

185.    This Count alleges fiduciary breaches against the Director Defendants (the "Conflicts of Interest Defendants").

186.   At all relevant times, as alleged above, the Conflicts of Interest Defendants were fiduciaries within the Plan within meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

187.   ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

188.   The Conflicts of Interest Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by, *inter alia*: failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities; and by otherwise placing their own and/or the Company's interests above the interests of the participants with respect to the Plan's investment in the Company's securities.

189.   As a consequence of the Conflicts of Interest Defendants' breaches of fiduciary duty, the Plan suffered millions of dollars in losses, as its holdings of Company Stock were devastated.  If the Conflicts of Interest Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other participants and beneficiaries, lost a significant portion of their retirement investments.

190.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO ADEQUATELY MONITOR OTHER FIDUCIARIES AND PROVIDE THEM WITH ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY THE DIRECTOR DEFENDANTS)

191.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

192.   This Count alleges fiduciary breaches against the Director Defendants (the "Monitoring Defendants").

193.   At all relevant times, as alleged above, the Monitoring Defendants were fiduciaries, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

194.   As alleged above, the scope of the fiduciary responsibilities of the Monitoring Defendants included the responsibility to appoint, remove, and, thus, monitor the performance of other Plan fiduciaries.

195.   Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

196.   The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their

appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

197. Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

198. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their appointee(s), to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the appointees' imprudent actions and inaction with respect to Company Stock;

    (b)    failing to ensure that the monitored fiduciaries appreciated the true extent of Company's precarious financial situation, and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

    (c)    to the extent any appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the

Plan's assets and, in particular, the Plan's investment in Company Stock; and

(d)     failing to remove appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered Company Stock an imprudent investment during the Class Period.

199.    As a consequence of the Monitoring Defendants' breaches of fiduciary duty, the Plan suffered tremendous losses. If the Monitoring Defendants had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

200.    The Monitoring Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches despite having knowledge of them.

201.    Therefore, as a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan and indirectly the Plan's participants and beneficiaries, lost millions of dollars of retirement savings.

202.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), the Monitoring Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## CAUSATION

203.    The Plan suffered millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Company stock

during the Class Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Plan's participants.

204.    Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and the Plan's participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company stock.

### REMEDY FOR BREACHES OF FIDUCIARY DUTY

205.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

206.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . ."

207.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

208.    Plaintiff, the Plan, and the Class are therefore entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. §

1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs and (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

209.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiff demands a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

A.    A Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the participants;

B.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

C.    Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.    Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      An Order that Defendants allocate the Plan's recoveries to the accounts of all participants who had any portion of their account balances invested in the common stock of LFG maintained by the Plan in proportion to the accounts' losses attributable to the decline in LFG's stock price;

F.      An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      An Order for equitable restitution and other appropriate equitable monetary relief against the Defendants.

DATED:  December 20, 2013                    Respectfully submitted,

Charles L. Williams, Esq.
James C. Skilling, Esq.
**WILLIAMS & SKILLING, P.C.**
4801 Radford Avenue, Suite A
Richmond, Virginia 23230
Telephone: (804) 447-0307
Facsimile: (804) 447-0367

**KESSLER TOPAZ MELTZER
 & CHECK, LLP**
Edward W. Ciolko, Esq.
Peter A. Muhic, Esq.
Donna Siegel Moffa, Esq.
Mark K. Gyandoh, Esq.
Julie Siebert-Johnson, Esq.
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff and the Proposed Class*